# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re: | |
| DONALD LEE ZOMBRO and<br>MARY ALLEN ZOMBRO, | Case No. 97-11370-RGM<br>(Chapter 7) |
| Debtors. | |
| DONALD LEE ZOMBRO and<br>MARY ALLEN ZOMBRO, | |
| Plaintiffs, | |
| vs. | Adv. Proc. No. 06-1166 |
| SUNTRUST BANK, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

THIS CASE is before the court on four motions: (1) the debtors' Motion for Partial Summary Judgment for Injunctive Relief (Docket No. 115); (2) the debtors' Motion for Summary Judgment Finding Willful Violation of the Discharge Injunction Sufficiently Culpable to Support Award of Attorneys Fees (Docket No. 158); (3) the bank's Supplemental Motion and Brief for Summary Judgment (Docket No. 159);[1] and (4) the bank's Motion to Alter and/or Amend Summary

---

[1] The bank's pending motion for summary judgment incorporates by reference an earlier motion for partial summary judgment (Docket No. 101). The court will consider it in conjunction with the bank's summary judgment motion that was argued on November 28, 2007.

1

Judgment Order dated June 26, 2007 (Docket No. 125).[2]  The bank also made an oral motion for

additional time to supplement the record.

# I
# Facts

The debtors filed their chapter 7 petition on February 26, 1997, and received their discharges

on June 18, 1997.  The debtors and SunTrust Bank[3] had two financial relationships prior to the

bankruptcy case.  The first was a credit card (the "Credit Card Account").  The debtors thought that

the Credit Card Account was satisfied by an accord and satisfaction fully consummated before they

filed bankruptcy.  The second was a second trust secured by their home on Artillery Road in

Manassas, Virginia (the "Mortgage Debt").  The Artillery Road Property was sold at foreclosure by

the first trustholder.  The resulting unsecured Mortgage Debt was discharged in bankruptcy.

The debtors became delinquent on their credit card account long before they filed bankruptcy

in 1997.  The bank sued them in the General District Court for the City of Richmond where

judgment was entered against them for $2,462.00 on June 27, 1995.  (Debtor's Ex. 15; Resp. and

Opp'n of SunTrust Banking to Debtors' Second Mot. for Partial Summ. J. at 2 (Docket No. 42).)

The debtors and the bank later agreed to a monthly payment plan of a reduced amount in full

settlement of the judgment.  Mr. Zombro paid the full agreed amount in 1996 ahead of schedule.

(Debtor's Exs. 15.1-15.3; Donald Lee Zombro Dep. ("Mr. Zombro Dep.") 19:18-21:21, May 11,

---

[2] The parties agree that the following constitute the record for the pending motions: the pleadings in this adversary proceeding; debtors' exhibits 1-30 filed on May 1, 2007 (Docket No. 75); the bank's exhibits A-F submitted at the hearing; the May 10, 2007 depositions of Carol Taylor and Chenell Gary; and the May 11, 2007 depositions of Donald Lee Zombro and Mary Allen Zombro.

[3] SunTrust Bank is the successor by merger to Crestar Bank, the financial institution with whom the debtors dealt with prior to the filing of their bankruptcy.  The court will refer to SunTrust Bank, in its own capacity and as successor to Crestar Bank, as the "bank."

2007; Mary Allen Zombro Dep. ("Mrs. Zombro Dep.") 13:1-25, May 11, 2007; Pls.' Resps. to Def.'s Initial Disc. at 4 (Docket No. 31, Ex. B).)  The bank reported the Credit Card Account as "ACCOUNT PAID/ZERO BALANCE; ACCOUNT PAID SATISFACTORILY; ACCOUNT CLOSED." on the debtors' credit report dated February 9, 2005.  (Compl., Ex. 2, at 5 (Docket No. 1); Debtor's Exs. 14, 14.1; Mrs. Zombro Dep. 13:24-25.)  The debtors did not list the Credit Card Account or the judgment in their bankruptcy schedules because it had been fully satisfied before they filed bankruptcy on February 26, 1997.  (Mrs. Zombro Dep. 7:18-8:4.)  From 1996 when they completed payments on the Credit Card Account settlement until May 17, 2005, the bank did not contact the debtors regarding the Credit Card Account.  (*Id.* at 19:15-20:2.)

The second account, the Mortgage Debt, involved the debtors' real property located on Artillery Road in Manassas, Virginia (the "Artillery Road Property").  The debtors purchased the Artillery Road Property in July or August 1987.  (Mr. Zombro Dep. 13:15-24.)  They granted the bank a second trust secured by the property.  (Mrs. Zombro Dep. 7:11-13; Resp. and Opp. of SunTrust Banking to Debtors' Mot. for Partial Summ. J. at 2 (Docket No. 31).)  The debtors owed the bank abut $18,000 on the Mortgage Debt when they filed bankruptcy on February 26, 1997. (Mrs. Zombro Dep. 7:15.)  They scheduled the Mortgage Debt and Crestar Bank, SunTrust's predecessor in interest, received notice of the bankruptcy filing.  (Debtor's Ex. 1.)

The debtors resided at the Artillery Road Property when they filed bankruptcy but moved in the spring of 1997. (Debtor's Ex. 18; Mr. Zombro Dep. 14:23-25.)  The first trust holder obtained relief from the automatic stay and sold the property at foreclosure.  (Mr. Zombro Dep. 14:10-12.) The bank lost its collateral as a result of the foreclosure.  The Mortgage Debt was discharged in bankruptcy on June 18, 1997.  The bank reported the Mortgage Debt to the credit bureaus as

"ACCOUNT CHARGED TO PROFIT AND LOSS," with a $0 balance and a date of last activity

of May 2002 on the debtors' credit report dated February 9, 2005. (Compl., Ex. 1 at 3 (Docket No.

1).) A bank employee testified that as a matter of policy, the bank does not report discharged debts

as discharged in bankruptcy, but rather reports them as a charge-off which is consistent with how

the Mortgage Debt was reported on the debtors' credit report. (Debtor's Ex. 23, Rebecca Twiddy

Dep. 37:11-23, 107:2-14, May 10, 2007.)

The debtors' problems with SunTrust began when they sold their home in Gainesville,

Virginia (the "Gainesville Property"). They purchased the Gainesville Property in 2000 or 2001,

three or four years after the bankruptcy case was closed and they had been granted a discharge. (Mr.

Zombro Dep. 15:12-16.) In March 2005, they signed a contract to sell the Gainesville Property (*id.*

at 22:5-11) and about the same time, a contract to purchase a home in Manassas, Virginia (the

"Manassas Property"). MBH Settlement Group, L.C. served as the settlement agent for the debtors'

sale of their Gainesville Property. (*Id.* at 22:17-19.) MBH conducted the usual title examination.

It showed the Credit Card Account judgment which the debtors had satisfied before February 1997

as a lien on the Gainesville Property. (Mrs. Zombro Dep. 12:1-15.)

MBH properly required the outstanding judgment to be resolved. Mrs. Zombro was unable

to provide proof that she had satisfied the judgment. She thought that the documents relating to the

settlement had been destroyed because it had happened so long before. (*Id.* at 14:4-19.) Angela

Adkins of MBH gave the debtors the name and telephone number of a person at the bank that they

should contact. (Debtor's Ex. 9.1.) On March 2, 2005, Mr. Zombro contacted the bank's Richmond

office, where he was ultimately routed to Carol Taylor, a recovery manager employed by the bank.

(Carol Taylor Dep. 11:16-12:12, May 10, 2007.) Although Mr. Zombro called because of the

unreleased judgment from the Credit Card Account, Taylor, who handled only non-credit card collections, erroneously thought he was calling about the Mortgage Debt. (Taylor Dep. 22:17-23:21). She recalled that the telephone call concerned a request for a payoff, and not a dispute regarding the debt itself. (*Id.* at 14:23-15:4.) Taylor did not notice the account notes in the bank's recovery system stating that the account had been discharged in bankruptcy. (*Id.* at 8:25-9:3.) When she pulled up the account, she only noticed that it was marked "Dead File 99F," which indicates a general dead file that Taylor's department would have worked to collect. (*Id.* at 50:4-7.) Taylor assigned the account to Chenell Gary, a recovery collector with the bank, who was the collector on rotation that week. (*Id.* at 12:8-16.) When an account is assigned Gary, one of her duties is to see if the account has been properly deadfiled or if it has been marked as a bankrupt account. (Chenell Gary Dep. 32:22-33:13, May 10, 2007.) Gary did not look (or did not look carefully enough) and missed the note dated June 23, 1997, which stated that the account was "DISCHARGED 061897-1ST D/T FORECLOSED."[4] (*Id.* at 33:14-22; Debtor's Ex. 9.) There is

---

[4] At the hearing on November 28, 2007, counsel for the bank suggested that a genuine dispute of material fact exists over whether the notation regarding the debtors' discharge on the bank's recovery system notes was present when Taylor and Gary reviewed the account. (11/28/07 Tr. 38:6-39:22 (Docket No. 169).) The court reviewed the record and found no evidence that the notation was absent when Taylor and Gary reviewed the account notes. While Taylor did testify at her deposition that she would have had to go back three or four screens in the bank's recovery system to see the notation regarding the discharge, there is no evidence that the notation was absent. To the contrary, the fair reading of Gary's deposition testimony is that the discharge note was present when she checked the account in March 2005:

> **Q:** Let me ask you this. Looking at exhibit 1, when it says discharged 61897, is there a possibility that those notes were added at a later time after March of 2005?
>
> **A:** I don't think so.

Gary Dep. 34:12-16.

In fact, the record shows that any failure of the bank's employees to see the discharge notation was the result of either not looking for the notation or not noticing it. *See id.* at 33:14-22 (Gary would have seen the discharge notation had she looked for it, but she failed to see it because she did not look or did not look carefully enough); Taylor Dep. 49:20-21 ("A thorough review wasn't done of the account."); *id.* at 9:2-3 (Taylor failed to notice that the account was in chapter 7); *id.* at 13:8-10 (Taylor's testimony that she was the person who failed to notice the bankruptcy discharge on the debtors' account).

no evidence of what else transpired on March 2, 2005, or what action Gary took in response to the account inquiry from Mr. Zombro.

On March 24, 2005, an unidentified employee in the bank's recovery collection department entered a note into the bank's recovery system stating that the debtors were "TRYING TO CLOSE IN APRIL." (Debtor's Ex. 9.) That same day, Gary received a fax request for a payoff of the debtors' account. Because Gary failed to see that the account she was servicing had been discharged in bankruptcy, she prepared a payoff of the Mortgage Debt and faxed it to Angela Adkins at MBH. (Debtor's Ex. 9; Gary Dep. 13:8-11.) The payoff letter, dated March 24, 2005, referred to the bank's account number for the Mortgage Debt and stated that the payoff was $28,245.05 and that interest accrued at the rate of $4.42 per day. (Debtor's Ex. 10.2.) Upon receipt of the payoff letter regarding the Mortgage Debt, MBH and the debtors entered into an escrow agreement on March 28, 2005, that required MBH to hold $30,000 of the proceeds of the sale of the Gainesville Property in escrow pending resolution of the bank's claim. (Debtor's Ex. 21.1; Mrs. Zombro Dep. 21:21-25.) This allowed the debtors to close on the sale of their Gainesville Property and the purchase of the Manassas Property, their new home.

During the period from March to May, 2005, while MBH and Mr. Zombro were dealing with the bank's Richmond office, Mrs. Zombro contacted a bank employee in Orlando, Florida, the bank's office that collects credit card accounts. (Debtor's Ex. 13; Mrs. Zombro Dep. 15:6-13.) The bank employee, Earlene Watkins, is a senior risk operation specialist. Mrs. Zombro told Watkins of the bankruptcy case and faxed a copy of the bankruptcy petition to Watkins. The debtors believed that the Credit Card Account had no relation to their bankruptcy case because it had been settled prior to the commencement of their case. (Mrs. Zombro Dep. 15:16-16:19.) Despite this

information, Watkins sent the debtors a letter dated May 17, 2005, stating that the balance on the

Credit Card Account was $6,870.71.  The bank offered to settle for a lump sum payment of

$4,465.96.  (Debtor's Ex. 13.)

The May 17, 2005, letter confused the debtors further.  They correctly thought that the Credit

Card Account was satisfied and that the Mortgage Debt was discharged in bankruptcy.  There were

inconsistent payoffs for what they thought was the Credit Card Account: $27,245.05 on March 24,

2005, and $6,870.71 on May 17, 2005.  (Mr. Zombro Dep.39:16-25; Mrs. Zombro Dep. 25:1-11.)

MBH was holding the $30,000 escrow and had been since the end of March when the debtors closed

on the Gainesville Property.  The debtors needed the escrowed funds.  No resolution releasing the

entire escrow to them seemed at hand.  For $4,465.96 they felt that they could end this unhappy

problem, obtain the release of the balance of the escrow, and live their lives unencumbered by their

financial past.  The debtors believed that the bank would only release the judgment – and that they

would only get the remainder of the escrowed funds – by making the payment demanded by the

bank.  (Mrs. Zombro Dep. 56:15-25.)  Accordingly, the debtors agreed to the settlement proposed

in the bank's letter of May 17, 2005.  MBH paid the bank $4,465.96 out of the escrowed funds and

disbursed the balance to the debtors.  (*Id.* at 55:16-20; Mr. Zombro Dep. 36:21-37:1; Debtor's Ex.

13.1.)

That, however, was not to be the end.  About five months later, on October 14, 2005, Gary

sent a letter that stated that the outstanding balance on the Mortgage Debt was $28,214.13 and

threatened that if arrangements to pay the outstanding balance were not made within five days,

further action would be taken.  (Debtor's Ex. 17.)[5]  Upon receipt of this letter, the debtors contacted

---

[5] Gary testified at her deposition that when the bank sends a payoff, it is normal procedure to later follow up with another letter.  (Gary Dep. 25:22-25.)

Gary and informed her of their bankruptcy and gave her the name of their counsel, Robert Weed. (*Id.* at 26:6-27:10.) Gary claims that this is the first time she knew of the bankruptcy. As a result, she forwarded the Mortgage Debt account to the bankruptcy department. (*Id.* at 27:23-28:1.) This should have been the end of this unhappy story. It was not.

The bank's records show that on November 26, 2005, the bank again called the debtors at which time the bank proposed a payment arrangement of $700 a month. The debtors reiterated their bankruptcy discharge and again gave the bank representative Mr. Weed's name. (Debtor's Ex. 2.2.) Another notation was made on December 8, 2005, which stated that the account's status was changed to "status 992- Bankruptcy - Dead file chapter 7." (*Id.*) A final notation was made on the Mortgage Debt account record on January 26, 2006, showing the debtors' bankruptcy case number, the chapter of the Bankruptcy Code under which the debtors filed, and the date of their discharge. (*Id.*)

## II
## Procedural History

The debtors filed this adversary proceeding on October 3, 2006. The original complaint pleaded a claim under the Racketeer Influenced and Corrupt Organizations Act which sought damages of $4,465.96 for the escrow funds paid to the bank by MBH, damages of $50,000 for the debtors' having to pay higher interest rates as a result of the bank's conduct, and treble damages under 18 U.S.C. §1964; a claim for declaratory relief that the Credit Card Account and the Mortgage Debt had been discharged; and a claim for injunctive relief requiring the bank to report the Mortgage Debt as discharged in bankruptcy. They sought attorney's fees and costs. Although not pled as a separate claim in the complaint, the debtors included language alleging a violation of the

discharge injunction. *See* Orig. Compl. ¶35 ("Sending a letter dated October 14, 2005, demanding payment of $28,214.13 on an account identified as [the Mortgage Debt] was an act to collect the debt in violation of this court's discharge injunction.").

The debtors filed their first motion for partial summary judgment on January 29, 2007 (Docket No. 27), which sought summary judgment on two separate matters: that the Mortgage Debt was discharged in bankruptcy; and that the bank's act of reporting the Mortgage Debt to the credit bureaus in 2002 as "ACCOUNT CHARGED TO PROFIT AND LOSS," rather than discharged in bankruptcy, was an act to collect a discharged debt. The bank opposed the motion (Docket No. 31). The motion was granted in part and denied in part. The February 21, 2007 order (Docket No. 37) declared that the Mortgage Debt was discharged in the debtors' bankruptcy case by the discharge order of June 18, 2007. The remainder of the motion for partial summary judgment was denied.

On February 10, 2007, the debtors filed a motion to amend the complaint (Docket No. 29). The bank filed a response (Docket No. 36). The motion was granted and the debtors filed their amended complaint on March 19, 2007 (Docket No. 46). The amended complaint largely tracks the original complaint except for the addition of a claim under the Fair Credit Reporting Act, which alleged that the bank's erroneous report of the Mortgage Debt after a credit reporting dispute initiated by the debtors was a violation of the FCRA. The debtors sought actual damages of $10,000, statutory damages of $1,000, and punitive damages of $25,000.

The debtors filed their second motion for partial summary judgment on February 11, 2007 (Docket No. 30), seeking judgment on the bank's liability for the $4,465.96 payment made by the debtors to the bank based on the bank's conduct alleged to be in violation of the discharge injunction. The bank opposed the motion (Docket No. 42). The parties filed supplemental

9

memoranda (Docket Nos. 43, 104, 107).  The bank filed a cross-motion for summary judgment on June 8, 2007 (Docket No. 101).[6]  At the hearing held on June 12, 2007, the bank agreed to return the $4,465.96 that the debtors had paid to it.  As a result, the court entered an order on June 26, 2007, styled "Consent Order Granting Partial Summary Judgment" which stated that the debtors' second motion for partial summary judgment was resolved by consent and ordered the bank to pay $4,465.96 to the debtors (Docket No. 117).  The bank filed a Motion to Alter and/or Amend Summary Judgment Order of June 26, 2007 (Docket No. 125), contending that it did not consent to entry of summary judgment against it.  Instead, the bank argued that it only consented to return the money without consenting to any finding or admission of liability.[7]

The debtors' third motion for partial summary judgment seeks an injunction requiring the bank to report the Mortgage Debt as discharged in bankruptcy with a date of last activity as June 1997 (Docket No. 115).  The bank opposes the relief requested (Docket No. 142).[8]

Both parties filed additional motions for summary judgment on November 9, 2007 (Docket Nos. 158, 159).  The debtors' fourth motion for summary judgment seeks a finding that the bank willfully violated the discharge injunction in a manner sufficiently culpable to support an award of attorney's fees.  The bank filed a response (Docket No. 161).  The bank's motion for summary judgment (Docket No. 159), which incorporates its earlier motion for summary judgment filed on June 8, 2007, seeks summary judgment on the RICO, FCRA, and interest rate claims and a finding that the bank did not willfully or intentionally violate the discharge injunction.

---

[6] The cross-motion is addressed below along with the bank's latest motion for summary judgment.

[7] The motion to alter and/or amend will be addressed below.

[8] This motion will be addressed below.

10

The motions presently pending are (1) the debtors' motion for summary judgment for injunctive relief; (2) the cross-motions on the discharge violation claims; and (3) the bank's motion to alter and/or amend the June 26, 2007, summary judgment order.

### III
### Discussion

The Federal Rules of Civil Procedure instruct that the court should grant a motion for summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c), made applicable by Fed.R.Bankr.P. 7056. The movant must show that no genuine issue of material fact exists. The burden then shifts to the non-moving party to come forward with admissible facts showing a genuine issue for trial. *See* Fed.R.Civ.P. 56(e). If the court determines that no material facts are disputed and the movant is entitled to judgment as a matter of law, then summary judgment is appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003).

### A. *The Bank's Supplemental Motion and Brief for Summary Judgment (Docket No. 159)*

The bank filed its most recent motion for summary judgment on November 9, 2007, which incorporated by reference its earlier motion for summary judgment dated June 8, 2007 (Docket No. 101). The bank seeks summary judgment on the debtors' claims for violations of RICO, FCRA, and the discharge injunction, and also seeks dismissal of the debtors' demand for damages for having allegedly paid higher interest rates as a result of the bank's conduct. Because both parties have

11

moved for summary judgment on the discharge injunction claim, the court will treat the bank's motion on that claim when it discusses the debtors' motion.

With respect to the remaining claims on which the bank seeks summary judgment, the debtors orally, in open court, withdrew each the claims without objection by the bank.  11/28/07 Tr. 3:22-4:2, 4:12-22 (Docket No. 169); 6/12/07 Tr. 13:5-11 (Docket No. 141).  The debtors also filed written memoranda stating they had withdrawn the claims.  *See* Mem. in Supp. of Mot. for Summ. J. Finding Willful Violation of the Discharge Inj. Sufficiently Culpable to Supp. Award of Attorney's Fees at 1 (Docket No. 158) ("The claim for damages of $50,000 for higher interest rate was withdrawn by plaintiff in open court."); *id.* ("The claim for three-fold damages under RICO was withdrawn by plaintiff in open court.").  *But see id.* at 2 ("[T]he FCRA claim is now withdrawn.").

The court treated the debtors' oral statements withdrawing the RICO, and interest rate claims as motions to dismiss these claims under Federal Rule of Civil Procedure 41(a)(2), made applicable by Federal Rule of Bankruptcy Procedure 7041.  The debtors admitted at the time they withdrew the claims that they lacked sufficient evidence to prove their claims.  *See id.* at 2; 6/12/07 Tr. 13:5-11; 11/28/07 Tr. 4:1-2.  The court granted the oral motions to dismiss the RICO and interest rate claims with prejudice.   In light of the dismissal with prejudice of these claims, the bank's motion for summary judgment with respect to these claims will be denied as moot.   The debtors' written statement withdrawing the FCRA claim is insufficient under Rule 41(a) because both parties must consent to a written stipulation of dismissal in writing.[9]  The written statement, though, evidences the debtors' consent to dismissal of this claim as requested by the bank in its motion for summary

---

[9] Rule 41(a) is not the exclusive manner in which a plaintiff may obtain dismissal of its complaint after the defendant has answered.  He may make a motion under Rule 41(b).  The debtors did this orally and in open court.  The bank did not object and the court granted the motion.  Although no order has been presented to date, the matter is resolved.

12

judgment.  The court will grant the bank's motion for summary judgment with respect to the FCRA

claim and dismiss it with prejudice.

### B.  *The Debtors' Motion for Partial*
### *Summary Judgment for Injunctive Relief (Docket No. 115)*

The debtors filed a motion for partial summary judgment seeking an injunction requiring the

bank to correctly report the status of the Mortgage Debt as "Discharged in Bankruptcy" with a date

of last activity of June 1997, which is when the court granted the debtors' discharge.  It is undisputed

that as of February 2005, the Mortgage Debt was being reported on the debtors' credit report as

"ACCOUNT CHARGED TO PROFIT AND LOSS," with a $0 balance and a date of last activity

of May 2002.  The court previously declared that the discharge in this case included the Mortgage

Debt (Docket No. 37).  The bank's own uncontroverted testimony is that it reports discharged debts

as charged off rather than discharged in bankruptcy.

The debtors contend that industry standards require creditors to report a discharged debt as

discharged in bankruptcy with a zero balance, citing to the FCRA and related Federal Trade

Commission regulations.  The bank's response to the motion for partial summary judgment does not

dispute this, except to the extent the debtors seek to rely on this fact to prove an intentional violation

of the discharge injunction.  *See* Def.'s Resp. to Pls.' Third Mot. for Summ. J. for an Inj. for

Mandatory Credit Reporting at 1 (Docket No. 142).  The bank indicates it "is in the process of

forwarding the discharge order to the credit reporting agencies, with instructions to report the debts

as discharged," *id.* at 2, and that proof of compliance is forthcoming.  At the last hearing in

November 2007, the bank's counsel stated that he had sent letters to the credit reporting agencies

and argued that the request for injunctive relief was moot.  11/28/07 Tr. 86:21-87:1.

13

The bank must report the Mortgage Debt to the credit reporting agencies in the manner requested by the debtors. The bank's defense is that the request for the injunction is moot because the bank has already taken the actions requested. There is no indication that the bank has in fact complied. It merely states that it is in the process of advising the credit bureaus of the discharge.[10] *Cf. Helmes v. Wachovia Bank, N.A. (In re Helmes)*, 336 B.R. 105, 109 (Bankr.E.D.Va. 2005) (injunctive relief denied where the court was satisfied that erroneous notation on credit report had already been corrected). Because the bank has not complied and, particularly here, where the bank's representative testified that the bank's own policy is not to report discharged debts as discharged, relief is appropriate. The court will grant an injunction requiring the bank to correct the reports so that they show that the Mortgage Debt as "Discharged in Bankruptcy" with a date of last activity of June 1997, and a zero balance due.[11]

### C. *Cross-Motions for Summary Judgment on Discharge Violation*

The parties filed cross-motions for summary judgment on the debtors' claim for violation of the discharge injunction (Docket Nos. 158, 159), for which the debtors now seek only attorney's fees as damages.

Before reaching the merits of the cross-motions, the court will first address certain procedural matters raised by the bank. First, bank's counsel asserted at the hearing that the complaint and amended complaint failed to plead a violation of the discharge injunction and that a

---

[10] It s not entirely clear to the court what the bank has done or is doing. It cannot determine whether a letter from counsel is a proper means to correct the report or whether there is an established procedure to do so. The court concludes that while the bank may be in the process of making a last minute effort to correct the reports, it has not yet done so.

[11] The court discusses the debtors claim of a discharge violation based on the errant credit reporting, in Part III.C.

14

discharge violation was not alleged until the filing of the debtors' most recent summary judgment motion on November 9, 2007.  11/28/07 Tr. 66:25-67:7, 78:13-21.

The court finds no merit to the bank's plea of surprise.  In their complaint, the debtors explicitly allege a discharge violation twice and concluded with an allegation of the jurisdictional basis for the claim.  Even the title of the complaint contributes to putting the bank on notice of the discharge violation claim.[12]  The amended complaint did not vary these allegations or the complaint's title, but rather only appended a claim under the Fair Credit Reporting Act.  In addition, both the original and amended complaints specifically demand reasonable attorney's fees in the prayer for relief.[13]  Under the notice pleading approach adopted in Federal Rule of Bankruptcy Procedure 7008, the bank had sufficient notice both of the claim (violation of the discharge injunction) and the remedy (attorney's fees) sought by the debtors as well as supporting allegations of fact.  *See* Fed.R.Civ.P. 8(a)(2), made applicable by Fed.R.Bankr.P. 7008(a); *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007) ("Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'") (internal quotation marks and citations omitted).

The bank also asked for leave to take additional discovery or to supplement the summary judgment record on the discharge violation claim, which the court took under advisement.  The court will treat this as a request under Federal Rule of Civil Procedure 56(f)(2) for a continuance to

---

[12] *See* Compl. for Violation of the Discharge Injunction and to Afford Further Relief to Debtor Against SunTrust ¶¶31, 35, 36 (Docket No. 1).  For example, paragraph 35 alleges as follows: "Placing 'charged to profit and loss' status . . . in the debtors' credit files in May 2002 was an act to collect the debt *in violation of this court's discharge injunction*" (emphasis added).

[13] *See* Compl. for Violation of the Discharge Injunction and to Afford Further Relief to Debtor Against SunTrust ¶50 (Docket No. 1); Compl. for Violation of the Discharge Injunction and to Afford Further Relief to Debtor Against SunTrust ¶50 (Docket No. 46).

present additional facts in opposition.  At the hearing, the bank's counsel stated that they had never

taken discovery on the issue of a willful violation of the discharge injunction because it was not an

issue until the debtors raised it in their November 9, 2007, summary judgment motion.[14]  The court

finds the bank's assertion of surprise and lack of sufficient time to take discovery on the discharge

violation claim not to be credible.  The bank's final motion for summary judgment—which was filed

on November 9, 2007, nearly simultaneously with the debtors' final summary judgment

motion—*itself* sought summary judgment on the discharge violation claim:

> Lastly, the Plaintiffs have not established any willful or intentional violation of the
> discharge stay by Defendant, which would give rise to any damages, nor have any
> damages resulting from the violation been proven. . . . Therefore, Defendant is
> entitled to summary judgment as to this adversarial matter in its entirety.

Defendant's Supp. Mot. and Br. for Summ. J. at 2-3 (Docket No. 159).  The bank is not prejudiced

by the debtors' motion for summary judgment on the discharge violation where, as here, it cross-

moved for summary judgment on the same claim.  Moreover, the bank's willfulness or lack thereof

is peculiarly within the bank's knowledge.  Discovery directed to the debtors is unlikely to assist the

bank in this regard.  The Rule 56(f) motion will be denied.

    The debtors allegation that the bank willfully and intentionally violated the discharge

injunction is founded on  six actions taken by the bank.  The bank does not contest that it took the

six actions.  Rather, in its cross-motion for summary judgment, it asserts that the debtors' failed to

show that the acts were intentional violations of the discharge injunction and that the bank's actions

were innocent, that is, in response to communications initiated by the debtors.

---

[14] "I believe counsel for SunTrust is struggling with it because he has not submitted – we have not submitted any affidavits relating to that willfulness because it wasn't an issue until the November 9th occurred.

    "There was no discovery that was done on the issue because it wasn't an issue of the complaint before.  The discovery that was done was done on the complaint related to the acts relating to the RICO and relating to the Fair Credit Reporting Act, but not willful violation of the stay that had not been pled."  11/28/07 Tr. 78:18-79:2.

The court need not find that all six actions taken by the bank were willful and intentional violations of the discharge injunction.  One violation is enough.  There are two acts that stand out among the six alleged:  the bank's October 14, 2005 letter and November 26, 2005 telephone call[15] to the debtors.  They will be discussed first.

On October 14, 2005, Gary of the bank's recovery collection department sent a follow-up letter to the debtors repeating the payoff figure on the Mortgage Debt.  The letter reiterated the payoff figure but went further.  It stated that the debtors should "contact this office within five (5) days *to make suitable arrangements and avoid further action*" (emphasis added).  According to Gary's deposition testimony, a second letter is routine when a borrower requests payoff information. The question is not whether a creditor may discuss voluntary repayment of a discharged debt when a debtor initiates the communication, but whether this bank went too far.  Here, the "follow-up" letter was itself intended to collect a discharged debt.  The initial inquiry was made on March 24, 2005.  The follow-up letter was almost seven months later.  It followed a prolonged silence – as far as Gary knew – from the debtors.  The bank, although possibly not Gary,  knew why the debtors were silent.  The debtors had – they thought – solved the problem in May 2005 when they paid the bank $4,465.96 to release the escrow first established in connection with the Mortgage Debt, the debt Gary was seeking to collect.  While the extended delay in sending the follow-up letter is itself problematic, that is not all.  The second letter was more than a follow-up letter.  It was a collection letter.  It contained the additional demand to contact the bank within five days and the threat to take further action if they did not, a clear violation of the discharge stay.  Even if the bank properly

---

[15] There was a second telephone call on October 26, 2005 which will be discussed below.  At this point, however, it is only necessary to note that the bank's records state that on October 26, 2005, the debtors called the bank and provided additional information regarding their 1997 bankruptcy filing.

17

responded to the payoff request and properly followed up its payoff letter with an inquiry letter, the additional language was an improper demand for payment of a discharged debt. Even without knowing about the Credit Card Account, Gary knew or should have known of the bankruptcy discharge and should not have made the additional improper demand. The situation was aggravated by an additional call to the debtors. Except for collecting the discharged debt, there was no reason for the additional call.

The bank clearly had notice of the bankruptcy discharge. Its own records show a 1997 entry recording the date of the bankruptcy discharge. *See* Debtor Ex. 2.2. Gary testified that she was supposed to review the notes to see if a bankruptcy or discharge had been noted, but that she failed to see the bankruptcy notation because she did not look. The bank's failure to check its own records cannot excuse the dunning letter sent on October 14, 2005. Likewise, it does not excuse the bank's follow up phone call of November 26, 2005, in which the bank proposed a repayment plan on the discharged Mortgage Debt. These actions are different than the March 24, 2005, payoff letter requested by the debtors. Here, the bank initiated the follow-up contact, demanded payment and threatened further action.

The bank endeavors to rely on this court's opinion in *Helmes v. Wachovia Bank, N.A. (In re Helmes)*, 336 B.R. 105, 109 (Bankr.E.D.Va. 2005), in opposing the debtors' summary judgment motion. In *Helmes*, the debtors asserted an intentional violation of the discharge injunction arising from the mis-reporting of a discharged debt as past due with a balance owing. They argued that mis-reporting the discharged debt was a per se violation of the discharge injunction. The court concluded that it was not a per se violation and that there was no intentional violation of the discharge injunction because the debtor's file was mistakenly not flagged as a bankruptcy case. *Id.*

18

at 109.  In *Helmes* the creditor promptly corrected the error when it was brought to its attention.
There was no pattern of discharge violations.  *Id.*  The court concluded from the totality of the
circumstances that the errant credit report was not an act intended to collect a debt, but rather an
excusable mistake.  *Id.*

This case is different.  Unlike the mistaken credit reporting in *Helmes* which was not on its
face an act to collect a discharged debt, the October 14 letter and the November 26 phone call in this
case cannot be characterized as anything but attempts to collect a discharged debt.  The letter
establishes a deadline by which the debtors must pay the Mortgage Debt or face "further action."
Notes from the telephone call show that the bank proposed repayment plan of payments of $700 a
month.  These actions are, on their face, efforts to collect the discharged Mortgage Debt.

This case is also different from *Helmes* because, here, the bank's own files were properly
documented to reflect the discharge, but the bank's employees on at least two occasions either
ignored or failed to see the note and proceeded to contact the debtors about a discharged debt.  The
bank is charged with the knowledge of the contents of its own records. The failure to properly
review the bank's own records is not an excusable mistake.  If it were, there would be no violations
of the discharge injunction, only "mistakes."  In *Helmes,* the error to properly flag the account was
explained and the bank's actions thereafter were computer generated and without human
intervention.  The bank had adequately set up its system and the act complained of was an isolated
failure.  This all occurred  during a period when the computer system was in the process of being
changed.

This case further differs from *Helmes* in the speed with which the banks corrected the errors.
In *Helmes,* the bank immediately corrected the error when it found out about it.  Here, the bank only

began to correct the improper credit report months after this adversary proceeding was commenced and years after the complaint was known or should have been known. In fact, efforts to correct the improper credit report apparently commenced only on the eve of the hearing on the debtors' motion for summary judgment seeking to enjoin the bank to correct the improper credit report. In *Helmes* the bank's prompt action was consistent with an innocent violation of the discharge injunction an negated a finding of willfulness. While promptness of correction of an error is not the determining factor in finding willfulness or the lack of willfulness, it is a factor.

*Helmes* is also different because there was no pattern to the bank's actions. Here, there may be a pattern. The bank consistently improperly reports discharged debts as written off. There is a clear distinction between the two.

The bank in this case properly articulates the legal principle enunciated in *Helmes:* Not every action that offends the discharge injunction is actionable. An honest mistake may be a legitimate defense. However, merely showing where the bank's system went wrong is not enough.[16] Here, the summary judgment record shows that the bank knew of the bankruptcy discharge and that the information was easily and readily available to the bank employees working on the account. In these circumstances, without any further explanation for the error, and in light of the additional actions, mistake is not a defense. The mistake is not excusable. The court finds the October 14, 2005, letter and the November 26, 2005, telephone call were intentional violations of the discharge injunction and will grant the debtors summary judgment.[17]

---

[16] In *Helmes* the bank not only showed where its system failed but also the circumstances in existence at that time that explained the failure. It developed a considerable record on these issues.

[17] The court need not determine whether the other four act also were discharge violations. One improper act is sufficient to find a violation of the discharge injunction. Here, there are two acts. The record is not sufficient to resolve the remaining four allegations on summary judgment.

Whether the second phone conversation on October 26, 2005, violated the discharge

_____

The first allegation is the bank's reporting the status of the Mortgage Debt on the debtors' credit report as "ACCOUNT CHARGED TO PROFIT AND LOSS." It is unclear what balance was shown on the credit report. The credit report may, in fact, not show an outstanding balance of $18,903, but rather only the high credit balance was $18,903. The balance, though, is not the essence of the complaint. The essence is the manner in which the report is made. An account charged off to profit and losses merely removes it from the bank's balance sheet. It is not an acknowledgment that the debt is discharged. The debtors fear that a future prospective lender would not want to make a loan to them for fear that SunTrust could still sue them but would make a loan to them if it knew that there were no other competing obligations and no other potential claims against the debtors' resources. Such competing claims could interfere with the prospective lender's ability to be repaid as agreed. Whether this distinction was used by the bank to assist in collecting discharged debts is the real question. While the manner in which the bank reported the discharge Mortgage Debt was not proper, the evidence of the bank's intent is conflicting. On the one hand, reporting the Mortgage Debt with a zero balance owing may be inconsistent with the intent alleged by the debtor. On the other hand, the bank's consistent policy of not reporting discharged debts as discharged in bankruptcy and a credit bureau report five years after the discharge may be consistent with an intent to improperly use the credit report as a means to collect a discharged debt. *See* Debtor's Ex. 23, Twiddy Dep. 107:2-14.

The debtors' contention that the bank's response to the settlement company's request for a payoff request is a willful and intentional discharge violation cannot be be resolved on summary judgment. This incident began when MBH was preparing to close on the debtors' sale of the Gainesville Property. MBH found a judgment lien and instructed the debtors to contact the bank to resolve the matter. On March 24, 2005, Chenell Gary in the bank's recovery collections department received a fax request with a payoff figure for the debtors' account. That same day, she responded by sending a payoff letter referring to the Mortgage Debt and indicating a payoff of $28,245.05 and per diem interest of $4.42. The letter itself reflects that it was prepared at the debtors' request.

The mere fact that Gary responded to a payoff request from the debtors or their agent does not necessarily amount to an act to collect a debt. The Bankruptcy Code explicitly permits a debtor to voluntarily repay any debt, including one discharged in bankruptcy. *See* 11 U.S.C. §524(f); *In re Cherry,* 244 B.R. 79, 87 n.13 (Bankr.E.D.Va. 2000). A discharged creditor's acceptance of voluntary payments from the debtor does not, without more, violate the discharge injunction. *See LaFave v. Ford Motor Credit Co. (In re LaFave),* 9 B.R. 859, 861-62 (Bankr.E.D.Mich. 1981). If a debtor seeks to voluntarily repay the debt and requests a payoff amount from the creditor, the creditor does not violate the discharge injunction simply by responding to the request. Here, however, there was more. Gary should have known that the debt was discharged in bankruptcy but failed to properly review the bank's records which she had before her. Gary is charged with acting with full knowledge that the debt was discharged in bankruptcy when the request was received. What else the bank knew is not presently clear. If the bank knew that the request arose because of the erroneous credit bureau report or the title search or that the debtors asserted that the debt was discharged but were only requesting the payoff out of compulsion, then the act of providing the payoff may be a violation of the discharge stay. The record does not permit this claim to be resolved on summary judgment.

The debtors claim that the bank coerced them to pay $4,465.96 by "consent[ing] to the release of the $30,000 from escrow by MBH only upon a payment of $4465.96." Here, the escrow was established to protect the bank in the payment of a discharged debt in accordance with Gary's payoff letter. The request for a payoff letter arose solely because the bank improperly reported the discharged Mortgage Debt and improperly failed to release the Credit Card Account judgment. Beyond this, the record is insufficiently developed for resolution on summary judgment. For example, the evidence is incomplete as to whether the bank used the allegedly outstanding Credit Card Account judgment as leverage to get the debtors to pay the discharged Mortgage Debt. The bank is charged with all the facts known to its collection divisions even if they are geographically or operationally separated. The record is limited as to whether bank card division knew or should have known that the Credit Card Account may have been paid off prior to bankruptcy or whether the bank intended to threaten collection on one debt in order to coerce payment of a discharged debt.

injunction cannot be answered on this record.  The bank's notes reflect that on October 26, 2005, the debtors initiated a telephone conversation with the bank.  The debtors provided additional information regarding their bankruptcy filing.  This by itself does not constitute a discharge violation.  But the record is silent as to what else transpired during the phone call, *i.e.*, whether the bank made any effort to collect a discharged debt.  The court will deny the cross-motions for summary judgment as to this claim.

The court concludes that the bank violated the discharge injunction in sending the October 14, 2005, letter, and making the November 26, 2005, phone call.  The debtors will be granted summary judgment as to liability on these claims and the bank will be denied summary judgment.

### D.  *The Bank's Motion to Alter and/or Amend Summary Judgment Order Dated June 26, 2007 (Docket No. 125)*

The bank seeks an order altering or amending the court's order of June 26, 2007, which states that the debtors' motion for partial summary judgment was resolved by consent and orders the bank to return $4,465.96 to the debtors.  The bank argues that the order could be interpreted to mean that the bank consents to or concedes liability.  The court reviewed the order in question.  The order cannot be read as counsel suggests.  It merely resolved the matter by directing payment.  The bank had no defense.  Either the debt was satisfied by the 1996 compromise or was discharged in bankruptcy even though not scheduled.  *See In re Alexander*, 300 B.R. 650, 656 (Bankr.E.D.Va. 2003) (chapter 7 discharge generally encompasses both scheduled and unscheduled debts).  It should be noted that although the Credit Card Account debt was not scheduled, the bank was scheduled and had actual notice of the bankruptcy filing.  The court was concerned because the bank knew or

22

should have known that it had no colorable defense, and withheld payment of the $4,465.96 apparently as leverage.  The court, therefore, ordered the refund to be made.  But, there was no determination of whether the debt was satisfied by compromise or discharged in bankruptcy.  The motion to alter and/or amend will be denied.

**IV**
**Conclusion**

The debtors are granted summary judgment as to their claim for injunctive relief and are granted summary judgment as to liability for their discharge violation claim relating to the October 14 and November 24, 2005, communications.  The remainder of the parties' cross-motions for summary judgment regarding alleged violations of the discharge injunction are denied.  The bank's motion for summary judgment as to the RICO and interest rate claims are moot as the court has already dismissed them with prejudice.  In light of the debtors' consent to the bank's motion for summary judgment on the FCRA claim, the bank will be granted summary judgment to this extent and the FCRA claim will be dismissed with prejudice.  Lastly, the bank's motion to alter and/or amend the court's order of June 26, 2007, is denied.

Alexandria, Virginia
April 14, 2008

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Robert R. Weed
David C. Whitridge
Robert B. Baumgartner

Copy mailed to:

Paul G. Wersant
Morris, Schneider & Prior
1587 N.E. Expressway
Atlanta, Georgia 30329

13931